# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70116-9-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| KELAN DELAST POTTS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: July 21, 2014 |

SPEARMAN, C.J. — Kelan Potts was convicted by a jury of robbery in the first degree. On appeal, he contends his conviction must be reversed because the trial court improperly (1) refused to give a lesser included jury instruction on assault in the second degree and (2) denied his two requests for substitution of defense counsel. We conclude the trial court correctly rejected his proposed jury instruction and did not abuse its discretion in denying his requests for substitution of counsel. Accordingly, we affirm.

## FACTS

Early in the morning on August 3, 2012, Cameron Willard was standing outside Tia Lou's, a club in downtown Seattle. He noticed a man watching him intently and asked, "[H]ey, do I know you?" Verbatim Report of Proceedings (VRP) (01/17/13) at 58.[1] The man said he did not, but was planning on getting to know Willard. Willard backed away. After seeing a second man coming toward

---

[1] The verbatim report of proceedings for the trial contains three volumes. Two volumes are marked "January 16 & 17, 2103." "VRP (1/17/13)" refers to the volume marked Volume I, which contains pages 2-84. "VRP (1/22/13)" refers to the third volume, dated January 22, 2013 and marked Volume II.

him from behind a car, he ran across the street to try to escape. The last thing he saw before he lost consciousness was a third man coming toward him.

Jorge Tovar was riding in his friend's car when he saw Willard being attacked by three people. Tovar honked the horn of the car, then got out of the car and ran toward the scene while his friend called 911. The suspects dispersed. Tovar noted that two of them looked similar to one another while the third was heavy-set. The heavy-set suspect, who had actively participated in the attack, wore a white shirt, denim shorts, and red tennis shoes. That suspect also had long braids or dreadlocks tied in a ponytail. Tovar, who had previously worked in an emergency room, stayed with Willard and attempted to administer aid.

Two patrol officers received a report of an assault and arrived at the scene to find Willard on the ground with Tovar next to him. Tovar provided a description of the three suspects and their direction of travel. Three other police officers were patrolling the area near Tia Lou's on mountain bicycles when they were alerted to the assault and received Tovar's description of the suspects. They rode in the direction of the suspects' departure and soon observed Adolph Pines, Antwuan Pines, and Potts walking quickly, with Potts lagging behind the other two. Potts had long dreadlocks and was wearing a white shirt, denim shorts, and red sneakers. The officers stopped the three men.

After the three defendants were arrested, the mountain bicycle officers found a gold chain necklace belonging to Willard on the ground near the area

2

where they stopped Adolph Pines and Antwuan Pines.[2] 1/17/13 RP 66-68, 79-80.

In addition, Willard later realized that his hat, bracelet, cell phone, and wallet

were missing. Id. at 65-66, 68. These items were never recovered. Id. at 66.

Willard suffered a black eye, multiple cuts and bruises over his face and body,

and a broken jaw that had to be repaired with steel plates. Id. at 61-65.

Subsequent deoxyribonucleic acid (DNA) testing established that Willard's blood

was present on Potts's shirt, shorts, and left shoe, as well as on Adolph Pines's

shoes.

The State charged Potts with robbery in the first degree based upon the

infliction of bodily injury.[3] Approximately three months before trial, Potts made

two requests to discharge his court-appointed attorney. First, at an October 5,

2012, hearing before the Honorable Palmer Robinson:

> MR. McDONALD: The reason I have a matter preliminary is Mr. Potts wishes to discharge me as his counsel.
> I'd turn it over to him at this point.
> I can tell the Court, if you want to know, what I've done with the case so far, but he wants to discharge me and is dissatisfied with my service so far in this case. But I can answer any questions the Court may have.
>
> THE COURT: Okay. Thank you. Mr. Potts? Tell me what the problem is.
>
> MR. POTTS: My life is on the line and –
>
> THE COURT: I'm sorry?
>
> MR. POTTS: He's not in interest of my best interest.

---

[2] Potts was stopped approximately half a block down the hill from the other two men.

[3] Adolph Pines and Antwuan Pines pleaded guilty to robbery in the first degree.

THE COURT: What has he not done that he – Mr. McDonald, that he should have done or done that he shouldn't have done?

MR. POTTS: It's a lot of it. I asked him to put a Brady motion in for me. He won't do that. I asked for – like my mom, my baby's mom, they've been calling him. He don't call back. He comes see me, like, right before court. So it's like he ain't got no time for me.

THE COURT: Okay. Anything else.

MR. POTTS: No, your Honor.

THE COURT: Okay. Mr. McDonald?

MR. McDONALD: We've – I've seen Mr. Potts on a couple of occasions, had contact with his baby's mom on several occasions, in fact, before the bail hearing. I'm not aware of any calls that were missed, and I certainly will return – or will call now that he's told me.

I've put into my – I've given a redacted discovery request to [the prosecutor]. I have an investigator who has been out to the scene so far and is looking for witnesses. It occurs to me that witness interviews with the passenger who – and I – a third party passenger in a car passing by the alleged incident won't return a call to an investigator.

And it is my understanding that the alleged victim wants to be interviewed with the prosecutor present.

So I'm doing what I can.

I've also communicated to him a potential settlement of the case, and Mr. Potts so far has rejected that offer and did not wish to waive speedy trial for preparation of the case.

So I'm – I think I'm doing everything that I can at this point. And I've reviewed today with him the DNA results that we received this week, so I'm doing everything that I can at this point.

THE COURT: Okay. Well, Mr. Potts, you are entitled to counsel. You're entitled to have a lawyer appointed for you at public expense if you can't afford a lawyer.

And you're entitled to effective assistance of counsel. And effective assistance of counsel means having a lawyer investigate the State's case and do his own investigation, to convey to you any offers that are made, and make a

4

recommendation. It's up to you whether or not you decide to accept the State's offer.

It's up to you whether or not you decide to testify at trial. It's up to you whether or not you waive a jury at trial, although certainly your co-defendants have rights in that regard, but it – one of the things about having effective assistance of counsel, also, is that it's the lawyer's job to decide the legal tactics in terms of whether or not either it's appropriate to or the timing of bringing a Brady motion.

I don't – I don't know anything about your case other than reading over the Cert, so I'm not commenting on that, but I'm just saying that's Mr. McDonald's decision.

I don't hear anything that makes me think that you're not being provided effective assistance of counsel. [ . . . ] So I'm not going to grant your motion to have the Office of Public Defense appoint another lawyer.

MR. POTTS: All right.

VRP (10/5/12) at 5-8.

Approximately two weeks later, Potts again moved to discharge his attorney, this time before the Honorable Ronald Kessler:

THE COURT: Mr. Potts?

POTTS: I feel I need a new lawyer. I don't feel like he's in this for my best interest.

THE COURT: All right. Anything else you want to say?

POTTS: No, I just want a new lawyer.

THE COURT: All right. Sounds to me like this is the same argument that was made before Judge Robinson.
The motion is denied.
Any further motions to discharge counsel will be without oral argument in writing only.

VRP (10/17/12) at 3.

At trial, Potts's defense was that although the State had proved that he committed an assault, it had not proved that he committed a robbery.

5

Accordingly, Potts proposed jury instructions on assault in the second degree as a lesser included offense of robbery in the first degree. The trial court rejected the proposed instruction.

Potts was convicted as charged and the trial court imposed a standard-range sentence. Potts appeals the judgment and sentence, assigning error to the trial court's (1) rejection of his proposed lesser included instruction and (2) denials of his requests for substitution of counsel.

## DISCUSSION

### Lesser Included Instruction

Potts first claims the trial court erred in refusing to give a lesser included jury instruction on assault in the second degree. In determining whether a defendant is entitled to have the jury instructed on a lesser included offense,[4] we apply the two-part test established in State v. Workman, 90 Wn.2d 443, 584 P.2d 382 (1978). State v. Nguyen, 165 Wn.2d 428, 434-35, 197 P.3d 673 (2008). "'First, each of the elements of the lesser offense must be a necessary element of the offense charged. Second, the evidence in the case must support an inference that the lesser crime was committed.'" Id. (quoting Workman, 90 Wn.2d at 447-48).

---

[4] Generally, a defendant cannot be tried for an offense not charged. State v. Irizarry, 111 Wn.2d 591, 592, 763 P.2d 432 (1988) (citing Const. art. 1, § 22 (amend. 10); State v. Carr, 97 Wn.2d 436, 439, 645 P.2d 1098 (1982); State v. Pelkey, 109 Wn.2d 484, 487, 745 P.2d 854 (1987)). One statutory exception to this rule is that a defendant "may be found guilty of an offense the commission of which is necessarily included within that with which he or she is charged in the indictment or information." RCW 10.61.006.

Here, only the first ("legal") prong is at issue.[5] We review a trial court's decision concerning the legal prong of the Workman test de novo. State v. Tamalini, 134 Wn.2d 725, 729, 953 P.2d 450 (1998). Under the legal prong, "if it is possible to commit the greater offense without committing the lesser offense, the latter is not an included crime." State v. Harris, 121 Wn.2d 317, 320, 849 P.2d 1216 (1993) (citations omitted).

Here, Potts was charged with robbery in the first degree by means of inflicting bodily injury. The elements of that crime are: (1) unlawfully taking personal property from another by the use or threatened use of immediate force, violence, or fear of injury; and (2) inflicting bodily injury in the commission of the robbery or in immediate flight therefrom. RCW 9A.56.190; RCW 9A.56.200(1)(a)(iii). "'Bodily injury'" is defined as "physical pain or injury, illness, or an impairment of physical condition[.]" RCW 9A.04.110(4)(a).

Potts sought to have the jury instructed on assault in the second degree by means of reckless infliction of substantial bodily harm. RCW 9A.36.021(1)(a). This crime is committed when the defendant "[i]ntentionally assaults another and thereby recklessly inflicts substantial bodily harm." RCW 9A.36.021(1)(a). "'Substantial bodily harm'" is "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part[.]" RCW 9A.04.110(4)(b).

---

[5] The trial court found that there was a factual basis for the proposed lesser included instructions but concluded the legal prong of Workman was not met. The State concedes that the factual prong of Workman was met.

"Substantial bodily harm" is a more serious level of injury than "bodily injury." As the State observes, a minor injury such as a scrape or a bruise could meet the definition of "bodily injury" without meeting the definition of "substantial bodily harm."[6] It is therefore possible to commit robbery in the first degree by means of inflicting bodily injury without committing assault in the second degree, which requires the infliction of substantial bodily harm. Accordingly, the legal prong of Workman is not met and the trial court properly denied Potts's proposed lesser included offense instruction.

## Substitution of Counsel

Potts next claims his right to effective assistance of counsel under the United States and Washington State constitutions[7] was violated, requiring reversal of his conviction, because the trial court twice denied his requests to discharge his court-appointed attorney. We review a trial court's denial of a motion for the appointment of new counsel for abuse of discretion. State v. Varga, 151 Wn.2d 179, 200, 86 P.3d 139 (2004). A defendant seeking substitution of counsel must show good cause, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the

---

[6] Potts concedes that assault in the second degree requires a greater degree of injury than robbery in the first degree but contends the legal prong was nonetheless met because the seriousness of Willard's injuries in this case was not in dispute. We disagree. The legal prong is not dependent on the facts and evidence in a given case, but on whether each element of the lesser offense is a necessary element of the charged offense. Workman, 90 Wn.2d at 447-48.

[7] The United States and Washington State constitutions provide a criminal defendant with the right to assistance of counsel. U.S. Const. amend. VI; Wash. Const. art. I, § 22. The right to counsel necessarily includes the right to effective assistance of counsel. United States v. Cronic, 466 U.S. 648, 654, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); State v. A.N.J., 168 Wn.2d 91, 98, 225 P.3d 956 (2010).

defendant and his attorney. State v. Stenson, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997). "Attorney-client conflicts justify the grant of a substitution motion only when counsel and defendant are so at odds as to prevent presentation of an adequate defense." Id. (citations omitted). "[I]f the relationship between lawyer and client completely collapses, the refusal to substitute new counsel violates [the defendant's] Sixth Amendment right to effective assistance of counsel." United States v. Moore, 159 F.3d 1154, 1158 (9th Cir. 1998) (citing Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir. 1970)). In determining whether a trial court properly denied a request for substitution of counsel, we consider (1) the extent of the conflict between the defendant and counsel, (2) the adequacy of the trial court's inquiry into the conflict, and (3) the timeliness of the defendant's motion for new counsel. Id. at 1158-59.

Initially, the State does not argue that Potts's requests for new counsel, which were made three months before trial, were not timely. We will therefore assume, without deciding, that the requests were timely.

Regarding the extent of the conflict between Potts and defense counsel, Potts contends it was serious because he twice indicated to the trial court that he did not believe counsel was acting in his best interests. But such a comment establishes only "general dissatisfaction and distrust with counsel's performance," which is insufficient to justify appointment of substitute counsel. Varga, 151 Wn.2d at 200. When Potts made his first request, he was asked by the trial court what counsel had done or failed to do. He asserted that (1) counsel did not want to file a Brady motion, (2) counsel had failed to return phone calls

9

from him and the mother of his child, and (3) counsel did not spend enough time visiting him. The trial court properly determined that these reasons were insufficient to establish good cause for substitution of counsel. First, as the court noted, filing a Brady motion was a matter of trial strategy. "A disagreement over defense theories and trial strategy does not by itself constitute an irreconcilable conflict entitling the defendant to substitute counsel, because decisions on those matters are properly entrusted to defense counsel, not the defendant." State v. Thompson, 169 Wn. App. 436, 459, 290 P.3d 996 (2012), rev. denied, 176 Wn.2d 1023, 299 P.3d 1172 (2013). As for the second and third reasons cited by Potts, they do not demonstrate a "complete breakdown in communication" between Potts and defense counsel. Stenson, 132 Wn.2d at 734. Defense counsel explained below that he had met with Potts on a couple occasions, had communicated a settlement offer to Potts, had made contact with the mother of Potts's child several times, and was unaware of any missed calls. Potts did not dispute defense counsel's assertions below.

Potts also contends that the trial court's inquiry into his conflict with defense counsel was inadequate. But we agree with the State that the trial court invited him on both occasions to explain why he sought appointment of new counsel and Potts was not able to articulate a valid reason. The first time he requested new counsel, he gave several reasons in response to the trial court's question as to what defense counsel had done or failed to do. When the court asked if he had anything else to say, Potts said no. The court considered Potts's reasons and explained why they did not suffice for the appointment of new

10

counsel. The second time Potts requested new counsel, he stated only that counsel was not in his "best interest." When the trial court attempted to make a deeper inquiry into Potts's dissatisfaction and asked him whether he wanted to say anything else, he declined.

In sum, the record does not show that Potts had good cause for substitution of counsel. The trial court acted within its discretion in denying his motions for substitution of counsel.

*Affirmed.*

WE CONCUR:

Spearman, C.J.

Leach, J.

Dwyer, J.